UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

David R. Horn,

Plaintiff,

v.

Civ. No. 01-967 (JEL/JGL)
ORDER

University of Minnesota,

Defendant.

---

Judith K. Schermer, Esq., Judith K. Schermer, P.L.C., appeared for Plaintiff David R. Horn.

Jeffrey G. Vigil, Esq., and Jennifer L. Frisch, Esq., Associate General Counsel, Office of the General Counsel, appeared for Defendant University of Minnesota.

---

This is an action by David Horn, a former assistant coach of the University of Minnesota women's hockey team, against the University of Minnesota (University). Horn alleges that the University violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 (2000) (Title VII), and the Equal Pay Act, 29 U.S.C. § 206(d) (2000) (EPA), by paying him less than a similarly situated female assistant coach, retaliating against him for complaining about the wage disparity, and constructively discharging him. The matter is before the Court on the University's Motion for Summary Judgment. For the reasons set forth below, the Court grants the University's motion.

## I. BACKGROUND

In October 1996, the University hired Laura Halldorson as head coach of the women's hockey team in preparation for the team's inaugural season. The University created two assistant coach positions: a first assistant to be appointed to a 12-month term, and a second assistant to be appointed to a 10-month term. In July 1997, Halldorson hired Elizabeth Witchger as the first

FILED FEB 25 2003
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTERED FEB 25 2003
DEPUTY CLERK'S INITIALS

assistant coach, and hired Horn as the second assistant coach. Horn accepted the position knowing that Witchger would be the first assistant, that he would be the second assistant, and that he would be compensated accordingly. At the end of their initial contractual terms in June 1998, the University renewed both contracts and increased Witchger's and Horn's salaries. After the 1998-99 season, the University renewed Witchger's contract and increased her salary. The University also revalued Horn's position. Effective July 1, 1999, the University appointed Horn to a 12-month term at an increased salary. On August 25, 1999, Horn notified the University that he had accepted an offer from another employer, and that September 7, 1999, would be his last day at the University.

At some point during the 1997-98 season, Horn researched the salaries of coaches in the University's women's athletic department. After discovering the University paid Witchger more than him, Horn hired an attorney who contacted the Director of Women's Athletics in August or September 1998, to complain about Horn's pay. Later in September, Horn, his attorney, and the Women's Athletic Director met to discuss his complaints. Horn contends the University retaliated against him and constructively discharged him after he complained about the disparity between his compensation and that of Witchger.

## II. DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the nonmoving party to

respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**A. Wage Discrimination**

Horn's first claim is that the University paid him less than a similarly situated female employee, Witchger. To evaluate a claim for unequal pay for equal work on the basis of gender, a court uses the same standard without regard to whether the plaintiff raises the claim under Title VII or the EPA. *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 718-19 (8th Cir. 2000); *McKee v. Bi-State Dev. Agency*, 801 F.2d 1014, 1019 (8th Cir. 1986). To establish a prima facie case of wage discrimination, Horn must show that the University paid him less than Witchger for equal work in jobs that required equal skill, effort, and responsibility, and that were performed under similar conditions. *See Buettner*, 216 F.3d at 719. To be considered equal, jobs need not be identical; substantial equality suffices. *Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1029 (8th Cir. 2002); *Krenik v. County of Le Sueur*, 47 F.3d 953, 961 (8th Cir. 1995). "Whether two jobs are substantially equal 'requires a practical judgment on the basis of all the facts and circumstances of a particular case,' including factors such as level of experience, training, education, ability, effort, and responsibility." *Hunt*, 282 F.3d at 1030 (quoting *Buettner*, 216 F.3d at 719). Differences in job titles or classifications are not dispositive. *Id.* at 1029.

It is undisputed that the University paid Horn less than Witchger. Thus, the issue is whether Horn's and Witchger's positions were substantially equal. The University asserts that the positions were not substantially equal because Witchger performed duties that Horn did not. Horn points to

no area where he had responsibilities that Witchger did not. He concedes that Witchger's position required her to perform additional duties, but maintains that his position was substantially equal to her position because her additional duties were "minimal." Witchger's additional duties fall into four categories.

First, Witchger was responsible for starting and maintaining a booster club. She searched for donors and individuals willing to serve as the club's president, vice president, treasurer, and secretary. She signed up members, approximately 30 to 40 in the first or second season. She ran the club's meetings and wrote its newsletters. Even after the executive staff assumed the responsibility of formulating ideas to support the team, Witchger continued to act as the liaison between the team and the club, to write the newsletter, and to preside over meetings.

Second, Halldorson entrusted Witchger with the responsibility of representing the team at meetings in Halldorson's absence. Witchger represented the team at meetings where the team was introduced to members of the University and surrounding community, the press, boosters, and potential boosters. During the first season, Witchger appeared in Halldorson's place at a couple of meetings.

Third, Witchger organized all team travel until July 2000, and arranged team meals and transportation for home games. Horn characterizes these duties as "hardly indicative of greater skill or responsibilities." Horn ignores that he did not face the demands on his time and the logistical difficulties that Witchger confronted by organizing the team's travel and meals.

Finally, Witchger also created a database to record information on potential recruits. Horn describes the database creation as a "one-time project," and notes that all of the coaches made entries after its creation. Nevertheless, Witchger set it up, which required her to have organizational and computer skills not required of Horn.

Based on this evidence, no rational trier of fact could conclude that Horn's position was substantially equal to Witchger's position. Witchger's position involved greater responsibilities and demanded greater efforts and skills than Horn's position. Because Horn failed to establish a prima facie case of wage discrimination, the Court grants the University's motion on this claim.

**B. Retaliation**

Horn's second claim is that the University violated Title VII and the EPA by retaliating against him for complaining about the disparity between his compensation and Witchger's compensation. For Horn's retaliation claim to survive the University's motion for summary judgment, Horn must first establish a prima facie case of retaliation which consists of three elements: (1) he participated in a protected activity; (2) an adverse employment action was taken against him; and (3) a causal connection exists between the adverse employment action and the protected activity. *See Krause v. City of La Crosse*, 246 F.3d 995, 1000 (7th Cir. 2001); *Stevens v. St. Louis Univ. Med. Ctr.*, 97 F.3d 268, 270 & n.2 (8th Cir. 1996) (assuming no significant differences exist between Title VII and the EPA with respect to claims of retaliatory termination). The University concedes that Horn's complaints about his compensation constitute protected activity. The University argues, however, that Horn has failed to establish the second and third elements of his prima facie case.

Not everything that makes an employee unhappy constitutes an adverse employment action. *LaCroix v. Sears, Roebuck & Co.*, 240 F.3d 688, 691 (8th Cir. 2001). Instead, an adverse employment action consists of a material employment disadvantage, such as a change in salary, benefits, or responsibilities. *Id.* Horn identifies four actions and argues that, either individually or collectively, they constitute adverse employment action.

First, he argues that Halldorson failed to treat him with respect and did not effectively communicate with him. According to Horn, Halldorson was upset, angry, disgusted, and unfriendly,

and decreased her communications with him.[1] This evidence, viewed in the light most favorable to Horn, is insufficient to establish that he was subject to an adverse employment action. "Title VII is not 'a general civility code for the American workplace.' Therefore, in employer retaliation cases, 'ostracism and rudeness by supervisors and co-workers do not rise to the level of an adverse employment action.'" *Thorn v. Amalgamated Transit Union*, 305 F.3d 826, 831 (8th Cir. 2002) (citations omitted). Thus, Horn cannot establish a prima facie case of retaliation based on Halldorson's failure to treat him with respect and her inability to effectively communicate with him.

Horn next argues that Halldorson's failure to invite him to participate in her summer 1999 hockey camp constitutes an adverse employment action. Although he states that working there was a "privilege of employment" and that it was "customary" for the assistant coaches to work at it, he acknowledges that the camp was "not a formal University activity." Indeed, Horn does not dispute that Halldorson maintained the camp separately from her work as head coach of the women's hockey team and that the University did not support the camp financially or in any other way. Notwithstanding Horn's assertion that the University's guidelines on assistant coach compensation specifically encourage assistant coaches to participate in camps as a benefit of employment, the guidelines reveal that the University does not negotiate contracts for assistant coaches to participate in camps and does not compensate them for such activities. Because participation in Halldorson's

---

[1] At his deposition, Horn summarized how Halldorson's treatment of him changed after she learned of his complaints:

> As far as retaliation, trying to sort of describe it, the way [Halldorson] treated me before this came up, she was always very friendly, polite. Every once in awhile us coaches would get together and go out at night or whatever. As soon as this happened, she no longer was very friendly toward me. Facial expressions, body language, tone of voice when she would talk to me was like she was annoyed with me, like she was disgusted with me. If I were to bring things up in meetings that we had or whatever, she would sort of, I don't know, roll her eyes or wouldn't take it as well as she would beforehand, right? Beforehand she was very receptive to my ideas and very polite. Whether she went with them or not, she was very up front with it.

summer camp was not part of Horn's employment with the University, he did not experience an adverse employment action when Halldorson failed to include him in the 1999 camp.

Third, Horn asserts that his 1998-99 performance evaluation constitutes an adverse employment action. In that evaluation, Halldorson indicated that his overall performance "need[ed] improvement." Within individual categories of job performance, his ratings ranged from "poor" to "professionally competent." Halldorson noted that he was occasionally disrespectful and unprofessional in his communications with her and that he needed to "improve in the areas of trust, respect, and loyalty." Although this evaluation could be considered negative, it does not constitute an adverse employment action because "a negative review is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." *LaCroix*, 240 F.3d at 692. In this case, there is no evidence that the University detrimentally altered the conditions of Horn's employment after the evaluation. In fact, the University revalued his position, making it a year-round position at an increased salary, within two weeks of the evaluation. Horn therefore cannot establish a prima facie case of retaliation based on the evaluation.

Horn also maintains the University "papered" his personnel file with notes of performance issues that Halldorson kept throughout the 1998-99 season. Halldorson began taking notes in September 1998, on the same day she learned of Horn's complaints about his compensation. The notes culminate in the June 1, 1999, entry in which she recommends that Horn's contract not be renewed. As a factual matter, Horn's assertion that his personnel file was "papered" with the notes is incorrect. The University submitted Horn's complete University personnel file; the notes are not in it. Even if the notes had been placed in his personnel file, he cannot rely on them to establish a prima facie case of retaliation because the University did not use them to detrimentally alter the

terms of his employment. *See id.* Within one month after Halldorson submitted the notes, the University rejected her recommendation to not renew Horn's contract, and, instead appointed him to a 12-month term and gave him a raise.

Finally, Horn contends that the University engaged in a "pattern of reprisal" against him. A series of employment actions short of termination may constitute adverse employment action. *See Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 1997). For example, in *Kim*, an employer reduced an employee's duties, gave the employee much lower performance reviews, "papered" the employee's personnel file with negative reports (at least one of which was allegedly fabricated), and required the employee to undergo special remedial training. *Id.* at 1052-53, 1060. *Kim* declined to decide whether each act constituted an adverse employment action and held as a matter of law that the employer's conduct, as a whole, constituted adverse employment action. *Id.* at 1060. Horn's reliance on *Kim* is misplaced. The University did not reduce Horn's duties and did not require him to undergo remedial training. The University rejected Halldorson's recommendation to not renew his contract and did not use her notes or his performance evaluation to detrimentally alter the terms of his employment. In fact, the "pattern of reprisal" postulated by Horn culminated in the University appointing him to a 12-month position and giving him a raise. For these reasons, the Court rejects Horn's contention that the University systematically retaliated against him.

**C. Constructive discharge**

Horn's final claim is that the University constructively discharged him in violation of Title VII and the EPA. A constructive discharge occurs when an employee quits as a result of the employer's deliberate creation of intolerable working conditions with the intent to force the employee to quit. *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir. 1996). "'Constructive discharge requires considerably more than an unpleasant and unprofessional

environment.'" *Duncan v. Gen. Motors Corp.*, 300 F.3d 928, 936 (8th Cir. 2002) (quoting *Jones v. Fitzgerald*, 285 F.3d 705, 716 (8th Cir. 2002)). The conditions created by the employer must be intolerable to a reasonable person. *Tidwell*, 93 F.3d at 494.

The University argues *inter alia* that Horn's working conditions were not objectively intolerable. In response, Horn asserts that Halldorson's treatment of him and her evaluation of his performance during the 1998-99 season created an objectively intolerable work environment. The Court acknowledges that Halldorson's treatment of Horn may have created an unpleasant environment. Viewed in the light most favorable to him, the disrespect, rudeness, and decreased communications Horn describes, however, fall far short of what a reasonable person would consider intolerable.

The same conclusion is warranted with respect to Horn's contention that the evaluation created an intolerable situation. Assuming that the evaluation was unfair, Horn cannot establish that his working conditions were objectively intolerable based on the evaluation. *See Tork v. St. Luke's Hosp.*, 181 F.3d 918, 919 (8th Cir. 1999); *Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1160 (8th Cir. 1999) ("The working atmosphere was not ideal, but 'a feeling of being unfairly criticized or [having to endure] difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign."). Viewing the record in the light most favorable to Horn, no reasonable person would find Horn's working conditions intolerable.

## III. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. The University's Motion for Summary Judgment [Docket No. 26] is GRANTED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: February 25, 2003

JOAN ERICKSEN LANCASTER
United States District Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

C:\FORMS\APPEAL NO. CIV
Rev. August 11, 1995

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information <u>must</u> be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*